## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| **RUSH WATSON, II, and GERETTA WATSON,** | ) <br> ) <br> ) |
| **Plaintiffs,** | ) **CASE NUMBER:** <br> ) |
| **v.** | ) <br> ) |
| **HOMECOMINGS FINANCIAL, LLC,** | ) **CLASS ACTION COMPLAINT** <br> ) |
| **Defendant.** | ) **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs Rush Watson, II, and Geretta Watson ("Watsons") bring this action against Homecomings Financial, LLC ("Homecomings"), on behalf of themselves and all others similarly situated, and allege on information and belief as follows:

## INTRODUCTION

1.     This is a class action brought by Plaintiffs, on behalf of themselves and other similarly-situated minority homeowners, under the Equal Credit Opportunity Act, 15 U.S.C. § 1691, *et seq.* ("ECOA"), the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* ("FHA") and the Civil Rights Act, 42 U.S.C. § 1981, § 1982 *et seq.* ("CRA").  Plaintiffs seek remedies for themselves and the Class (defined in ¶ 34, below) for the discriminatory impact of Defendant's home financing policies and practices and for Defendant's discriminatory treatment of Plaintiffs and the class.

2.     Defendant has established a specific, identifiable and uniform credit pricing system (referred to herein as the "discretionary pricing policy"), a component of which authorizes unchecked, subjective surcharge of additional points and fees to an otherwise objective risk-based financing rate. In other words, after Defendant determines a finance rate acceptable to it, using objective criteria (e.g., the individual's credit history, credit score, debt-to-income ratio and loan-to-value ratios), Defendant's credit pricing policy then authorizes additional discretionary financing charges and interest mark-ups to minority homeowners. These subjective finance charges have a widespread discriminatory impact on African American applicants for home mortgage loans, in violation of the ECOA, FHA and CRA.

3.     Plaintiffs seek declaratory and injunctive relief, disgorgement and restitution of monies disparately obtained from African American homeowners as well as actual damages and punitive damages.

## THE PARTIES

4.     Plaintiffs Rush Watson, II and Geretta Watson are African American homeowners who reside at 4093 Lloyd Station Road, Mobile, Alabama 36693.

5.     Defendant Homecomings Financial, LLC, is a mortgage lender incorporated under the laws of the State of Delaware, with its headquarters

2

and principal place of business at 8400 Normandale Lake Blvd. Suite 250, Minneapolis, Minnesota 55437.

## JURISDICTION AND VENUE

6.     Plaintiffs invokes the jurisdiction of this Court pursuant to 28 U.S.C. § 1331, which confers original jurisdiction in a civil action arising under federal law.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) inasmuch as the unlawful discriminatory practice is alleged to have been committed in this District, and Defendant regularly conducts business in this District, and Defendant maintains its headquarters and principal place of business in this District.

## FACTUAL ALLEGATIONS

7.     Statistical disparities between African American and Caucasian borrowers are not mere happenstance, but instead result from a systematic and predatory steering of African Americans into less favorable loans. African American and Caucasian borrowers with the same qualifications should be treated equally. Instead, Defendants have discriminated against the African American homeowners through several discriminatory practices, including their discretionary pricing policy, described below.

### Homecomings' Discretionary Pricing Policy

8.     Homecomings is engaged in the business of originating, financing, securitizing, servicing, and selling residential mortgage loans.

3

9.      During the relevant time period, Homecomings offered home mortgage loans directly to consumers, including sub-prime loans. Homecomings also funds home mortgage loans arranged by its network of mortgage brokers, who are agents of Homecomings. Homecomings' loans are made in reliance on Homecomings' credit-granting and underwriting policies.

10.     Homecomings provides authorized mortgage brokers with substantial information about its loan programs, rates and credit criteria, as well as its policies for compensating mortgage brokers who arrange business for it.

11.     Homecomings authorizes mortgage brokers to accept applications on its behalf, quote financing rates and terms (with limitations set by Homecomings), inform credit applicants of Homecomings' financing options and originate finance transactions using Homecomings' forms all, in accordance with its policies.

12.     In the home mortgage finance transactions at issue, Homecomings advances the funds to make the loans and bears some or all of the risk of default. Homecomings provides its brokers with credit applications, loan contracts and other required financing forms, as well as instructions on filling out such documents necessary to complete home mortgage transactions.

13.     After a customer provides credit information to one of Homecomings' brokers, Homecomings computes a financing rate through an objective credit analysis that, in general, discerns the creditworthiness of the customer.

14.     These credit analyses consider numerous risk-related variables of creditworthiness, including credit bureau histories, payment amounts, debt ratios, bankruptcies, automobile repossessions, charge-offs, prior foreclosures, payment histories, credit score, debt to-income ratios, loan-to-value ratios and other risk-related attributes or variables. Homecomings uses these variables to determine a score for each credit applicant.

15.     Based on these objective risk-related variables and the resulting mortgage score, Homecomings derives a risk-based financing rate at which it would provide a home mortgage, called the "Par Rate." Alternatively, experienced Homecomings loan officers and brokers estimate the risk-related Par Rate by referring to the applicant's credit bureau-determined credit score.

16.     The applicable Par Rates and authorized discretionary charges are communicated by Homecomings to its brokers via regularly published "rate sheets." Such rate sheets are published by Homecomings via facsimile and internet.

17.     Although Homecomings' initial analysis applies objective criteria to calculate this risk-related Par Rate, Homecomings authorizes its brokers to employ a subjective component in its credit pricing system—the discretionary pricing policy—to impose additional non-risk charges.  Brokers have discretion, within the limits set by Homecomings, to impose discretionary mark-ups as additional points and interest.  When there is a rate mark-up, Homecomings shares the additional income with the broker.  In other words, the discretionary pricing policy incentivizes brokers to impose additional rate mark-ups to maximize their profit.

18.     The discretionary charges are paid by the customer as a component of the total finance charge (the "Contract APR"), without the homeowner knowing that a portion of their Contract APR was a non-risk-related charge.

19.     Homecomings' discretionary pricing policy, by design, causes persons with identical or similar credit scores to pay different amounts for the cost of credit.  As a result of using a subjective pricing component that is designed to charge persons with the same credit profiles different amounts of finance charge, the objective qualities of the initial credit analysis used to calculate the Par Rate are undermined and the potential for race bias becomes inherent in the transaction.

20.    The discretionary pricing policy, although facially-neutral (insofar as Homecomings uses the same or effectively the same policy for all credit applicants), has a disproportionately adverse effect on African Americans compared to similarly-situated Caucasians in that African Americans pay disparately more discretionary charges (both in frequency and amount) than similarly-situated Caucasians. Statistical analysis of discretionary charges imposed on African American and Caucasian customers of other mortgage companies that use credit pricing systems structured like that of Homecomings has revealed that African Americans, after controlling for credit risk, are substantially more likely than similarly-situated Caucasians to pay such charges.

21.    Homecomings' mortgage brokers are agents of Homecomings for the purpose of setting credit price, which is set based on Homecomings' policy.

22.    The disparate impact suffered by African American homeowners is a direct result of Homecomings' discretionary pricing policy in that Homecomings designed, disseminated, controlled, implemented and profited from the discretionary pricing policy creating the disparate impact.

23.    Homecomings has a non-delegable duty to ensure that its mortgage financing structure and policies do not have a disparate impact on legally-protected classes, such as African Americans. Despite having such a

non-delegable duty, Homecomings has chosen to use a commission-driven, subjective pricing policy that it knows or should have known has a significant and pervasive adverse impact on African American homeowners.

24.    The disparities between the terms of Homecomings' transactions involving African American homeowners and the terms involving Caucasian homeowners cannot be a product of chance and cannot be explained by factors unrelated to race, but, instead, are the direct causal result of the use of the discriminatory discretionary pricing policy.

25.    There are no legitimate business reasons justifying Homecomings' discriminatory discretionary pricing policy that could not be achieved by a policy that has no discriminatory impact or a greatly reduced discriminatory impact.

### Plaintiffs Rush Watson, II and Geretta Watson

26.    Plaintiffs Rush Watson, II and Geretta Watson own their own home in Mobile, Alabama.

27.    In January 2008, when the Watsons were seeking refinancing of their home, they met with a broker from Americas EZ Mortgage, Inc. The Watsons met with the broker on several occasions (in person and telephonically) to discuss the terms of financing. He recommended Homecomings Financial, LLC as an appropriate lender.

28.    On January 11th 2008, the Watsons entered into a mortgage transaction with Homecomings, arranged by Americas EZ Mortgage, Inc.

29.    According to the HUD-1 Settlement Statement, the Watsons paid $9,039.10 in settlement charges in connection with the loan, including a 1%, or $2,525.00, loan origination fee; a $500.00 broker processing fee; and a $670.00 "Lender Loan Charge."  Additionally, Defendant paid the broker a 1.82%, or $4595.50, yield spread premium outside of closing.   That yield spread premium payment was ultimately paid by Plaintiffs through an inflated interest rate on their loan.  Generally, the greater the interest rate on a mortgage loan is inflated above the "par interest rate," the greater the yield spread premium Defendant offers to pay the broker.  Therefore, had there been no yield spread premium paid, the interest rate on Plaintiff's loan would have been lower.   The yield spread premium Defendant offers to pay brokers incentivizes brokers to "sell" loans with inflated interest rates and terms to borrowers in the Class like Plaintiffs.  It is essentially a mechanism tantalizing brokers to upsell loan terms where possible.  Brokers' subjective use of this discretionary pricing system had a discriminatory impact on African American applicants for home mortgage loans, like Plaintiffs. Because of the yield spread premiums offered, Plaintiffs and other members of the Class were far more likely to be steered into loans with less favorable

terms (i.e., high interest rates and points) than their non-minority counterparts.

30.    Unbeknownst to the Watsons, the contract APR on the mortgage loan was actually a combination of an objective, risk-based calculation and a totally subjective, discretionary component added pursuant to Defendant's discretionary pricing policy.

31.    On information and belief, the Watsons were subject to Defendant's discretionary pricing policy.

32.    On information and belief, the Watsons were charged a disproportionately greater amount in non-risk-related credit charges than similarly-situated Caucasian persons.

## CLASS ACTION ALLEGATIONS

33.    Plaintiffs sue on their own behalf and on behalf of a class of persons under Rules 23(a) and (b)(2)-(3) of the Federal Rules of Civil Procedure.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of those provisions.

34.    **The Class** is defined as:

All Black or African American consumers who obtained a Homecomings home mortgage loan in the United States between April 14, 2003, and the date of judgment in this action (the "Class Period") and who were subject to Homecomings's discretionary pricing policy pursuant to which they paid discretionary points, fees or interest mark-ups in connection with their loan.

35.    Excluded from the Class are (1) Defendant, any entity or division in which Defendant have a controlling interest, and its/their legal representatives, officers, directors, assigns and successors; (2) the judge to whom this case is assigned and any member of the judge's immediate family; and (3) claims for personal injury, wrongful death and emotional distress and claims of consequential property damage and loss.

36.    The phrase "Black or African American" refers to the definition used in the 2000 United States Census.

37.    The phrase "discretionary pricing policy" refers to Homecomings' policy of authorizing its network of mortgage brokers to impose subjective, discretionary charges and interest mark-ups as a part of the finance charges on the loans they originate.

38.    *Numerosity*:  Plaintiffs do not know the exact size or identities of the proposed Class, since such information is in the exclusive control of the Defendant.  Plaintiffs, however, believe that the Class encompasses many hundreds or thousands of individuals who are geographically dispersed throughout the United States.  Therefore, the Class is so numerous that joinder of all members is impracticable.

39.    *Commonality/Predominance*:  All members of the Class have been subject to and affected by the same discretionary pricing policy.  There are questions of law and fact that are common to the Class, and predominate

over any questions affecting only individual members of the Class.  These questions include, but are not limited to:

a.      the nature, scope and operations of Defendant's discretionary pricing policy;

b.      whether Defendant is a creditor under ECOA because, for example, in the ordinary course of its business it participates in the decision of whether or not to extend credit to consumers;

c.      whether Defendant's discretionary pricing policy is a facially-neutral credit pricing system that has affected racial discrimination in violation of ECOA and the FHA;

d.      whether there are statistically-significant disparities between the amount of the discretionary charges imposed on African American homeowners and the amount of the discretionary charges imposed on Caucasian persons that are unrelated to creditworthiness;

e.      whether any legitimate business reason for the discretionary pricing policy can be achieved by a credit pricing system less discriminatory in its impact;

f.      whether the Court can enter declaratory and injunctive relief; and

g.      the proper measure of disgorgement or damages.

40.   *Typicality*:  The claims of the named Plaintiffs are typical of the claims of the Class and do not conflict with the interests of any other members of the Class in that both the Plaintiffs and the other members of the Class were subjected to the same discretionary pricing policy that has disproportionately affected African American homeowners.  Prosecution of Plaintiffs' claims will inure to the benefit of the entire proposed class.

41.   *Adequacy*:  The named Plaintiffs will fairly and adequately represent the interests of the Class.  Plaintiffs are committed to the vigorous prosecution of the Class's claims and have retained attorneys who are qualified to pursue this litigation and have experience in class actions—in particular, consumer protection mortgage companies for similar practices. Neither Plaintiffs nor counsel have any interest adverse to those of Class members.

42.   *Superiority*:  A class action is superior to other methods for the fast and efficient adjudication of this controversy.  A class action regarding the issues in this case does not create any problems of manageability.

43.   In the alternative, Defendant has acted or refused to act on grounds generally applicable to the case, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

## BASES FOR RELIEF

### COUNT ONE
### Violation of the Equal Credit Opportunity Act
### 15 U.S.C. § 1691, *et seq.*

44.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

45.     Homecomings is a creditor as defined in ECOA, and, in the ordinary course of its business, participated in the decision of whether or not to extend credit to Plaintiffs and Class members.

46.     Homecomings designed, disseminated, controlled, implemented and profited from the discriminatory policy and practice alleged herein (the discretionary pricing policy adopted by Defendant and clearly delineated above) which has had a disparate economic impact on African American homeowners compared to similarly-situated Caucasians.

47.     All actions taken by Homecomings employees and brokers were in accordance with the specific authority granted them by Homecomings and were in furtherance of Homecomings policies and practices, and its deployment of financial incentives to its brokers.

48.     As a result of Homecomings discretionary pricing policy, Homecomings has collected disproportionately more in finance charges from African American homeowners than from similarly-situated Caucasian persons for reasons totally unrelated to credit risk.

14

49.    Homecomings' discretionary pricing policy violates ECOA and constitutes actionably discrimination on the basis of race.

50.    Plaintiffs and Class members are aggrieved persons as defined in ECOA by virtue of having been subject to Homecomings' discriminatory discretionary pricing policy.

## COUNT TWO
### Violation of the Fair Housing Act
### 42 U.S.C. § 3601, *et seq*.

51.    Plaintiffs incorporate by reference the allegations contained in preceding paragraphs of this Complaint.

52.    Homecomings engaged in residential real estate-related transactions with respect to Plaintiffs and Class members.

53.    All actions taken by Homecomings employees and brokers were in accordance with the specific authority granted them by Homecomings and were in furtherance of Homecomings policies and practices, and its deployment of financial incentives to its brokers.

54.    Homecomings' discretionary pricing policy has resulted in discrimination with respect to Plaintiffs and Class members.

55.    As a result of Homecomings' discretionary pricing policy, Homecomings has collected disproportionately more in finance charges from African American homeowners than from similarly-situated Caucasian persons for reasons totally unrelated to credit risk.

56.    Homecomings' discretionary pricing policy violates the FHA and constitutes actionable discrimination on the basis of race.

57.    Plaintiffs and the Class are aggrieved persons as defined in the FHA by virtue of having been subject to Homecomings' discriminatory discretionary pricing policy.

**COUNT THREE**
**Violation of the Civil Rights Act**
**42 U.S.C. § 1981, § 1982**

62.    Plaintiffs incorporate by reference the allegations contained in preceding paragraphs of this Complaint.

63.    The Civil Rights Act prohibits racial discrimination in the formation and issuance of contracts, and intentional interference in the purchase and holding of real property.

64.    Homecomings Financial intentionally discriminated against Plaintiffs and the class by charging them higher interest rates than those charged to similarly-situated Caucasian mortgagors.

65.    By charging higher rates to Plaintiffs and class members, Homecomings Financial intentionally discriminated against the Class in (i) formation of contracts, (ii) making, performance, modification, and termination of contracts, (iii) the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship, and in their right to purchase and hold real property, or any combination of the foregoing.

66.    Homecomings Financial's actions violate 42 U.S.C. §§ 1981 and

1982.  As a proximate result of Homecomings Financial's systematic violation

of this statute, Plaintiffs and the class are entitled to the requested relief

provided under the Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the

members of the Class, demands judgment against Defendant as follows:

1.    An order certifying the proposed Class and any appropriate

subclasses and designating Plaintiffs as Class Representatives and their

counsel as class counsel;

2.    A declaration that, pursuant to 15 U.S.C. § 1691e(c), 42 U.S.C. §§

1981 and 1982, and 42 U.S.C. § 3613, the acts and practices of Defendant

complained of herein are in violation of the ECOA, the FHA, and the CRA;

3.    A permanent or final injunction, pursuant to 15 U.S.C.

§ 1691e(c), 42 U.S.C. §§ 1981 and 1982, and 42 U.S.C. § 3613(c), enjoining the

Defendant, and the Defendant's agents and employees, affiliates and

subsidiaries, from continuing to discriminate against Plaintiffs and the

members of the Class because of their race through further use of the

discretionary pricing policy or any non-risk related discretionary pricing

policy employed by Defendant and retain jurisdiction to ensure and, where

necessary, enforce compliance with the injunction;

4.     An order directing Defendant, pursuant to 15 U.S.C. § 1691e(c),

42 U.S.C. §§ 1981 and 1982, and 42 U.S.C. § 3613(c), to adopt and enforce a

policy that requires appropriate training of the Defendant's employees and its

network of mortgage brokers to prevent discrimination;

5.     An order directing Defendant, pursuant to 15 U.S.C. § 1691e(c),

42 U.S.C. §§ 1981 and 1982, and 42 U.S.C. § 3613(c), to monitor and audit the

racial pattern of its financings to ensure the cessation of discriminatory

effects in its home mortgage transactions;

6.     A declaration, pursuant to 15 U.S.C. § 1691e(c), 42 U.S.C. §§

1981 and 1982, and 42 U.S.C. § 1981, that Defendant must disgorge, for the

benefit of the Class, all or part of its ill-gotten profits it received from

imposing disproportionate non-risk charges on African American

homeowners pursuant to Defendant's discretionary pricing policy; and an

order directing the equitable distribution of such charges, as restitutionary

relief, to all appropriate Class members;

7.     Actual and punitive damages to the Plaintiffs and Class members

pursuant to 42 U.S.C. § 3613(c) and 42 U.S.C. §§ 1981 and 1982;

8.     Attorneys fees and costs, including but not limited to cost of

experts, pursuant to 15 U.S.C. § 1691e(d), 42 U.S.C. § 3613(c), 42 U.S.C. §

1988, or any applicable combination thereof; and

9.     Other and further relief as this Court finds necessary and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and the proposed Class, demand a

jury trial in this action for all of the claims so triable.


Dated:  April 14, 2009                    /s Timothy J. Becker
                                                    Hart L. Robinovich (MN 240515)
                                                    Timothy J. Becker (MN 256663)
     David M. Cialkowski (MN 306526)
     Zimmerman Reed, PLLP
     651 Nicollet Mall; Ste 501
     Minneapolis, MN 55402
     Telephone:  (612) 341-0400
     Facsimile:  (612) 341-0844

     George R. Irvine III
     Stone, Granade & Crosby, P.C.
     7133 Stone Drive
     Daphne, Alabama 36526
     Telephone:  (251) 626-6696
     Facsimile:  (251) 626-2617
     (*pro hac vice* application to be filed)

     Earl P. Underwood, Jr. (UNDEE6591)
     Attorney for Plaintiffs
     P.O. Box 969
     Fairhope, Alabama 36532
     Telephone:  (251) 990-5558
     Facsimile:  (251) 990-0626
     (*pro hac vice* application to be filed)